# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | |
|---|---|
| **J. GREGORY CARWIE, as the** ) | |
| **Conservator of the Estate of** ) | |
| **CHRISTOPHER FORWOOD,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **CASE NO.: 1:23-cv-00276-C** |
| ) | |
| **MOBILE COUNTY, ALABAMA,** ) | |
| **SAM COCHRAN and NOAH PRICE** ) | |
| **"TREY" OLIVER,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM OPINION AND ORDER[1]

This matter is before the Court on the Motions for Summary Judgment filed by the Defendants Sam Cochran and Noah Price "Trey" Oliver (Doc. 37) and Mobile County, Alabama (Doc. 38). Plaintiff has offered no opposition and has consented to the granting of these motions (Doc. 41).[2] The motions are ripe for review. After careful consideration of the Defendants' briefs, arguments, and all evidentiary materials provided in support of the motions for summary judgment, the Court makes the following findings of fact and conclusions of law and grants Defendants' motions for summary judgment.

---

[1] With the consent of the parties, this civil action has been referred to the undersigned Magistrate Judge to conduct all proceedings, including trial; to order entry of final judgment; and to conduct all post-judgment proceedings, in accordance with 28 U.S.C. § 636(c), Federal Rule of Civil Procedure 73, and S.D. Ala. GenLR 73. (*See* Docs. 13, 16).

[2] In other words, Plaintiff agrees that there are no material disputed facts and that the Defendants are entitled to judgment as a matter of law on all claims presented. The Court's inquiry with respect to record facts will not be whether plaintiff might have disputed facts alleged by defendants on summary judgment, but whether "the motion itself is supported by evidentiary materials." *United States v. One Piece of Real Property Located at 5800 SW 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1101 (11th Cir. 2004).

## I.    __Nature of Lawsuit__

In this section 1983 action, the Plaintiff J. Gregory Carwie, as the conservator of the Estate of Christopher Forwood, has sued Mobile County, and, in their individual capacity, Sam Cochran, former Mobile County Sheriff, and Trey Oliver, former warden of the Mobile County Metro Jail ("MCMJ" or the Jail"), for injuries sustained by his ward, Christopher Forwood, arising out of an altercation with another inmate, Marcos Oslan, on July 31, 2021, in a cell they were sharing in the "suicide watch" section of the Jail.

The essential factual allegations of the Complaint are that the MCMJ is an overcrowded facility; that Cochran and Oliver, acting with deliberate indifference, failed to adopt a proper classification system to reduce inmate-on-inmate violence; that inmates were being routinely housed without regard to their level of dangerousness; and that, as a result, Forwood, a non-violent offender, was housed with Oslan, in jail on a charge of murder (Comp., ¶¶ 11-13, 24, 33, 37, 43, 44-46, 50-51) (Doc. 1, PageID.3-4, 6-8).  Plaintiff alleges Defendants were placed on notice of the lack of an appropriate classification system by a 2009 letter from the Department of Justice ("DOJ") and failed and refused to implement such a system. (Id. at PageID.4, 6).

In Count One, incorporating these factual allegations, Plaintiff claims that Defendants violated his Fourteenth Amendment right not to be subjected to an unreasonable risk of serious harm while in jail.  He alleges that the Defendants knew of and consciously disregarded the substantial risk that Forwood would be injured while incarcerated and as a result he was housed with a murderer and brutally assaulted (Id. at PageID.9).

In Count Two, Plaintiff alleges that Cochran and Oliver, as a matter of policy and practice and with deliberate indifference, failed to properly train, assign, and supervise correctional officers regarding the classification of inmates and as a result Forwood was assaulted (Id. at PageID.9).

## II.    Findings of Fact

### A.    2009 Department of Justice Letter

1.      On January 15, 2009, the DOJ sent a letter to the president of the Mobile County Commission and to Defendant Cochran, as Sheriff of Mobile County, regarding its findings after an investigation into the conditions at the MCMJ.  (Ex. 1)[3] (Doc. 37-1, PageID.186).  In particular, the DOJ described deficiencies it found in the Jail's protection of inmates from harm, including failure to classify inmates appropriately based on their anticipated in-custody behavior (Id. at PageID.215-219).  It also identified deficiencies in security administration stemming from a lack of adequate policies, procedures, training and staffing (Id.). The DOJ made six recommendations for the Jail to implement to address these deficiencies (Id. at PageID.226).

2.      On April 24, 2009, Sheriff Cochran responded to the DOJ's letter through counsel, addressing each of the DOJ's recommendations (Ex. 2) (Doc. 37-1, PageID.230).  Regarding the recommendation to develop and implement an objective behavior-based classification system, counsel responded that the MCMJ was presently working on developing such a classification system (Id. at PageID.240). As to the five other recommendations, counsel responded that three of them had already been accomplished.  Regarding the two remaining recommendations for staff training and for the development of policies to document and investigate the use of force by staff and instances of inmate-on-inmate assault, counsel responded that the staff was adequately trained and that the Jail's policies were compliant with institutional needs and requirements (Id. at PageID.241).

### B.    MCMJ's Implementation of Objective Classification System in 2019

---

[3] The referenced enumerated exhibits in this Order are attached to the Defendants' Brief in Support of their Motion for Summary Judgment. (Doc. 37-1).

3.    In early 2018, the County obtained a grant from the National Institute of Corrections ("NIC") to improve and update the jail's classification system. The NIC is a federal agency established to provide a system to improve state and local correction agencies. (See Declaration of Noah Price "Trey" Oliver, ¶4 (Ex. 3) (Doc. 37-1, PageID.226).

4.    Following a three-day site visit to MCMJ from May 30 to June 1, 2018, NIC representatives issued a written Technical Assistance Report recommending that the Sheriff's office pursue adoption of an objective classification system that relied on a set of valid objective risk factors, including not only the inmate's current charge and/or sentencing status being used by MCMJ but also other factors such as the inmate's criminal history, previous institutional adjustment, age, and other key factors. See Technical Assistance Report attached as Ex. A to Oliver Dec. (Doc. 37-1, PageID.255).

5.    Using the NIC recommendations, Oliver and his team began researching contractors to help implement the recommended classification system and worked to secure funding for its implementation (Oliver Dec. ¶7) (Doc. 37-1, PageID.244). Cochran was aware of and encouraged the efforts of Oliver to implement the objective classification system. See Declaration of Sam Cochran (Ex. 4) (Doc. 37-1, PageID.423).

6.    In February of 2019, the County secured funds and entered a contract with the National Institute for Jail Operations ("NIJO") to assist in developing the objective classification system and training the MCMJ staff. NIJO is a national organization that provides legal-based resources to jails and correctional professionals across the country. (Oliver Dec. ¶8) (Doc. 37-1, PageID.245).

7.    NIJO's recommendations for the implementation of an objective classification system were described in its "Objective Classification Plan" report after two Jail visits by NIJO in

June 2019 (Phase I) and August 2019 (Phase II). See Objective Classification Plan attached as Ex. B to Oliver Dec. (Doc. 37-1, PageID.284).

8.      Phase I included a review of MCMJ's housing and facilities; a review of the Jail's processes for initial assessments, initial classifications, and reclassifications; meetings with the Jail's IT personnel and software designers regarding implementation of the new classification process into the Jail's electronic documentation system; and extensive training sessions with staff on the use of the new system.  (Id. at PageID.286-296).

9.      Phase II included additional staff training, a review of the data compiled since Phase I, audits of the new classification system, meetings to address questions, and final recommendations to tailor the objective classification system to the Jail's specific needs. (Id. at PageID.297-300).

10.     NIJO recommended the following factors to be included in the MCMJ's objective classification system:  severity of the current charge; prior offense history; severity of institutional behavior; escape history; number of disciplinary reports; most serious disciplinary conviction; number of prior felony convictions; age; previous time spent in department of corrections; overrides to increase or decrease custody level; and special housing factors. (Id. at PageID.292).

11.     The objective classification system recommended by NIJO was implemented by the MCMJ in late 2019 and was used to classify all inmates. See Final Mobile Metro County Jail Inmate Objective Classification Implementation Report attached as Ex. C to Oliver Dec. (Doc. 37-1, PageID.302).  This classification system included the development and use of initial classification instruments and custody reclassification scales for both male and female detainees. (Id. at PageID.309-333). Both Oslan and Forwood were classified and reclassified pursuant to these forms prior to the assault of July 31, 2021. See Forwood Custody Re-Classification Scale

and Oslan Custody Re-Classification Scale attached, respectively, as Exs. D and E to Oliver Dec. (Doc. 37-1, PageID.336, 340). Oslan was first classified under this system in December of 2019. See Oslan Custody Re-Classification Scale attached as Ex. E to Oliver Dec. (Doc. 37-1, PageID.340). Prior to the altercation between Oslan and Forwood, a policy was adopted that describes the objective classification system that had been in place since late 2019 and which conforms to the NIJO recommendations. See Mobile County Jail Policies and Procedures attached as Ex. F to Oliver Dec. (Doc. 37-1, PageID.350).

12.    After adoption of the objective classification system, Jail staff performed regular, randomized audits of the system to ensure compliance and improve the classification process. (Oliver Dec. ¶16); (Doc. 37-1, PageID.247).

**C.    Upgraded Physical Facilities to Increase Security and Reduce Overcrowding**

13.    In 2015, to stay ahead of any potential concerns with overcrowding, Oliver contacted the NIJO about performing a formal assessment of the physical plant and jail operations. In August of 2015, he met personally with NIJO representatives and assisted them in a multi-day site visit during which they toured the jail and interviewed staff. (Oliver Dec. ¶17) (Doc. 37-1, PageID.247).

14.    Upon completion of the on-site inspection, in late September of 2015, NIJO provided Cochran and Oliver with a written report of its inspection and recommendations. See Mobile County Metro Jail Assessment Report of Findings attached as Ex. G to Oliver Dec. (Doc. 37-1, PageID.354).

15.    In 2015, an architectural firm with expertise in criminal justice facilities was retained to assess and design possible jail renovations and additions based on the NIJO recommendations. (Oliver Dec. ¶20) (Doc. 37-1, PageID.248).

16.     The 2015 NIJO Report was an initial step towards expanding the docketing, jail intake and sally port area of the Jail. (Id. at PageID.249).  This area was lacking in sufficient physical size due to the number of arrests and new inmates the Jail experienced for much of Oliver's time as Warden. (Id. at PageID.248).

17.     In December of 2017, $15 million was allocated to move forward with the expansion of the docketing, jail intake, and sally port areas recommended in the 2015 NIJO report. Ultimately, the Jail obtained over $16 million for the construction of a new one-story 25,000 sq/ft. intake and booking facility, as well as renovations to 4,500 sq/ft of existing Jail facilities. The docketing area can now hold 300+ inmates as they await cell assignments, and the sally port has room for two buses and eight patrol cars. These renovations also included a property room and secure holding and transfer cells. These additions were completed in 2022. (Id. at PageID.249).

18.     In the summer of 2019, funding was secured to move forward with a renovation of the "Barracks" building on the MCMJ Complex. The Barracks had previously only allowed for housing of minimum-security inmates, leaving its capacity underutilized. Oliver and his team determined that by increasing the security features and "hardening" the infrastructure of the Barracks, the Jail could responsibly upgrade the Barracks to allow it to house medium-security inmates, alleviating overcrowding in the main Jail. (Id. at PageID.248).

19.     Since the Barracks were actively housing inmates during this project, Oliver and his team implemented a phased approach to the renovations, and the Barracks renovation was fully completed in 2022. (Id. at PageID.248).

20.     Cochran was involved in working with the County Commission on securing funding for these additions and renovations to the Jail.  (Cochran Dec. ¶17) (Doc. 37-1, PageID.426).

21.     Other upgrades in the Jail facilities have been made to improve security since the 2009 DOJ Letter.    In 2014, a new electronic inmate-to-staff messaging/request system was implemented via the installation of electronic kiosks in all housing areas. (Id. at PageID.249).    In August of 2018, the Jail completed a $1.9 million upgrade of the video camera and recording system. (Id. at PageID.249). Starting in 2019, the Jail partnered with AltaPointe[4] to obtain funding and implement a nationally recognized mental health screening program.    Inmates who screen positive for symptoms of severe mental illness are referred to a follow-up clinical assessment by a licensed mental health professional in the Jail. (Id.).

**D.     Further Efforts of Cochran to Relieve Overcrowding and Increase Staffing Levels**

22.     Starting in 2011, Sheriff Cochran partnered with Mobile County judges and the local district attorney to decrease the MCMJ population by holding special dockets to process inmates charged with certain less violent felonies who had been granted bail but were unable to afford the costs associated with their bail.    Cochran's office paid the yearly salary for a new position in the Mobile County Circuit clerk's office to process these cases. (Cochran Dec. ¶¶3-4) (Doc. 37-1, PageID.423-424).

23.     Starting early in his tenure, Cochran also made increasing the pay of correctional officers a priority to remain competitive and increase hiring and retention of jail staff (Id. at PageID.425). Working with the County Commission and Personnel Board, he was able to raise the minimum starting salary for correction officers from $27,946.63 in 2008 to $42,506.24 in his last year in office.  By the time he left office, a new correction officer with no college education was able to earn over $50,000 per year after per diem pay, bonuses and hazard pay were added.

---

[4] AltaPointe Health is an extensive healthcare system providing primary and behavioral healthcare in Alabama.

(Id. at PageID.425).  Nearly $100,000 annually was spent on recruitment advertising, beginning in 2016 at the latest.  This led to a corresponding increase in applications for corrections officers (Id. at PageID.426).  Cochran also founded the Mobile County Deputy Sheriff and Correction Officer Foundation to provide supplemental financial aid to Jail staff who wished to pursue a degree in criminal justice (Id.).

24.     All inmates are informed of the Jail's rules upon arrival and provided a copy of the MCMJ inmate handbook. See Cochran Dec. (Doc. 37-1, PageID.426); Oliver Dec. (Id., PageID.250); Mobile County Metro Jail Inmate Handbook attached as Ex. H to Oliver Dec. (Id., PageID.385). Inmate disciplinary matters are taken seriously and any inmates committing violations of the rules are subject to a disciplinary hearing and disciplinary enforcement as outlined in the jail inmate handbook. See Cochran Dec. (Id., PageID.426); Oliver Dec. (Id., PageID.250). Neither Oliver nor Cochran were aware of any pattern on the part of jail personnel in failing to conduct disciplinary hearings or enforcement. See Oliver Dec. (Id., PageID.250); Cochran Dec. (Id., PageID.427).

**E.     Altercation of July 31, 2021**

25.     On July 31, 2021, Yolonda Avery, a corrections corporal at the Jail, was assigned to work as the pod officer for Pod 1005 in Building 10, during the day shift (7:00 a.m. to 7:00 p.m.). See Declaration of Yolonda Avery (Ex. 5) (Doc. 37-1, PageID.434).

26.     The 1005 Pod is a semi-circular housing facility that contains six "wedges" with eight cells per wedge.  Each wedge has a common area ("day room") and the eight cells, adjacent to that day room, are arranged with four cells on the ground floor and four cells above them accessed by stairs and a walkway. The pod officer has the responsibility to oversee the pod and to staff the control area, which is a raised platform allowing for a direct line of sight into the day

room of each wedge and into each cell in the wedge beyond the day room. (Avery Dec. at PageID.435). A photograph taken from the pod officer's control area, attached as Exhibit A to Corporal Wilson's Declaration (Ex. 6) (Doc. 37-1, PageID.450), shows the pod officer's view of the 1005-I wedge and of cell 1092 in that wedge where Forwood, Gillman, and Oslan were housed.

27.    Working with Corporal Avery in Building 10, during the day shift on July 31, were floor officers M. Holmes, D. Spencer, and a trainee (Avery Dec. ¶ 8) (Doc. 37-1, PageID.435). The floor officers freely move within the wedges, monitoring and interacting with the inmates in each cell (Id. at PageID.435).

28.    Additionally, in the 1005-I Wedge, the wedge reserved for inmates on suicide watch (hereinafter the "Suicide Wedge"), the floor officers conduct frequent welfare checks on the inmates, at a minimum every 15 minutes. Inmates in the Suicide Wedge are under constant supervision by the staff, including observation by the pod officer, frequent rounds by floor officers, and security checks by other staff, including the security supervisor. (Id.).

29.    At the start of Corporal Avery's shift, inmates Forwood and Billy Gillman were housed in Cell 1092 in the Suicide Wedge. (Id.). At approximately 5:05 p.m., Oslan was brought to the 1005 Pod by Jail staff because he had expressed a desire to commit suicide (Id.).

30.    Inmates expressing a desire to commit suicide is a serious matter for the corrections staff. The medical/mental health staff is immediately notified of such a matter and medical staff will then determine whether placement in the Suicide Wedge is appropriate. If it is, an administrative segregation form is completed and signed by both the medical staff personnel and a correction supervisor. This was done for Oslan. See Avery Dec. ¶12) (Doc. 37-1, PageID.435-436); Administrative Segregation Notice attached as Ex. A to Avery Dec. (Id., PageID.439).

31.     Inmates in the Suicide Wedge receive higher levels of observation and supervision than any other area in the Jail.  They are also evaluated by mental health providers at least once every 24 hours and only those providers can remove an inmate from suicide watch.  Inmates are generally housed temporarily in the Suicide Wedge.  Thus, the individuals in that wedge and their housing assignments are regularly shifting due to the short-term nature of their housing.  See Avery Dec. ¶¶13-14 (Doc. 37-1, PageID.436).

32.     As the pod officer for the 1005 Pod, Corporal Avery was responsible for assigning cells to new inmates coming to the Suicide Wedge.  She makes these assignments with input from the floor officers and mental health staff when available (Avery Dec. ¶ 15 at PageID.436).  Corporal Avery had been trained on all MCMJ polices and was familiar with the Jail's objective classification system (Id. ¶ 3 at PageID.434).

33.     Corporal Avery's housing assignment decision for Oslan was complicated by an outbreak of COVID-19 cases in the Jail (Id. ¶ 16 at PageID.436).  Two days earlier, the day shift commander had ordered "minimal movement" of inmates due to the rising number of COVID-19 cases.  (Id) See Shift Commander Daily Activity Report attached as Ex. B to Avery Dec. (Doc. 37-1, PageID.440).  Several inmates within the Suicide Wedge were showing symptoms of COVID-19 and/or refusing COVID-19 tests (Avery Dec. ¶ 16 at PageID.436).  See Activity Report attached as Ex. C to Avery Dec. (Doc. 37-1, PageId.441).  Inmates refusing testing were quarantined and treated as COVID-19 positive. (Avery Dec. ¶ 16 at PageID.437)

34.     Oslan was in jail on charges of murder.[5]  Avery was aware that Oslan was classified as a maximum-security inmate and Forwood and Gillman were classified as minimum-security

---

[5] He later pled and was adjudged guilty of the charge on August 11, 2022.  See Order dated August 11, 2022, in State of Ala. v. Marcos Javier Morales Oslan, Mobile County Circuit Court, Case no. CC-2020-0021110 (Exhibit 7) (Doc. 37-1, PageID.452).

inmates.  However,  based on the  total number of inmates already in the Suicide Wedge, the number of inmates with COVID-19 issues who had to be isolated, and Avery's knowledge of and experience with the inmates already housed in the Suicide Wedge, as well as the experience of the floor officers with whom she conversed, Corporal Avery determined that placing Oslan in cell 1092 was the best available housing location for him.  (Avery Dec. ¶ 17 at PageID.437).

35.    At the time Corporal Avery made this decision, she had no knowledge of any conflicts, hostility, or other problems between Forwood, Gillman and/or Oslan.  None of them raised any objections to being housed together or requested a transfer.  Oslan exhibited no aggression or violent behavior and did not threaten any physical harm to Forwood or Gillman (Id. ¶ 18, at PageID.437).

36.    For the remainder of Corporal Avery's shift, she did not observe any problems between the inmates in cell 1092.  And neither of the floor officers reported to her any issues between the inmates in that cell (Id. ¶ 19).  These inmates would have had multiple opportunities to request a cell change, message over the intercom system, or wave for help in the event any problems arose.  None of them did (Id. ¶ 20).  Avery had no indication that an assault would occur involving Oslan and Forwood at any time prior to her leaving her shift at 7:00 p.m.  (Id. ¶ 19).

37.    At 7:00 p.m., Corrections Corporal Joshua Wilson took over as pod officer for Pod 1005 on the night shift (7:00 p.m. to 7:00 a.m.).  See Declaration of Joshua Wilson ¶5 (Ex. 5) (Doc. 37-1, PageID.446).  Corporal Wilson had been trained on all Mobile County Metro Jail policies and was familiar with the Jail's objective classification system (Id. ¶ 4 at PageID.446). Working with him in Building 10 on that evening were floor officers Frederick Johnson and Ethan Parmer (Id. ¶ 10 at PageID.447).  Prior to the altercation between Oslan and Forwood later that evening, Corporal Wilson had no notice or knowledge of any conflict, hostility, or other problems between

any of the inmates in cell 1092. Neither of the floor officers reported any issues to him concerning the inmates in cell 1092 prior to that altercation (Id. ¶ 12 at PageID.448).

38.    Immediately prior to the altercation, at approximately 8:50 p.m., Corporal Wilson was stationed in the control area, monitoring the cells in Pod 1005, and the two floor officers, Johnson and Parmer, were also in Pod 1005, assisting two nurses, Latasha Petteway and Megan Wright, in conducting medication passes. (Id. ¶ 13, at PageID.448). These medication passes typically take 45 to 60 minutes to complete the whole Pod. Therefore, they are paused periodically to allow the floor officers to conduct welfare checks (Id. ¶ 15).

39.    During the medication pass, at approximately 8:50 p.m., Corporal Wilson observed inmate Gillman in cell 1092 waving as if to get his attention (Id. ¶ 16). Corporal Wilson instructed Officer Parmer to investigate the cell. Parmer reported back that Forwood was bleeding from the nose and Oslan appeared agitated (Id. ¶ 17). Officer Johnson, Sergeant Danny Rowe, and Nurse Petteway responded to assist in the matter (Id. ¶ 18). Corporal Wilson called a "Code 80" for a medical emergency (Id. ¶ 19).

40.    From the start of his shift at 7:00 p.m., until he saw Gillman waving from his cell, Corporal Wilson remained in the control area, observing the cells in the 1005 Pod. From the pod control station, he had a direct line of sight into cell 1092. Before Gillman began waving in cell 1092, Wilson had no indication of any issues between inmates in that cell or that an altercation might break out between Oslan and Forwood (Id. ¶ 20 at PageID.449). The inmates in cell 1092 would have had multiple opportunities to request a cell change, message over the intercom system, or wave for help. None of them did until Wilson saw Gillman waving from the cell (Id. ¶ 22).

41.    No weapons were found in the cell or on the persons of Oslan or Forwood after the incident (Id. ¶ 23).

### III.    **Standard of Review**

A party in a lawsuit may move a court to enter summary judgment before trial. Fed. R. Civ. P. 56(a), (b*)*. Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Greenberg v. BellSouth Telecommunications, Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'"). "[T]he substantive law will identify which facts are material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial." *Id.* at 249. Only disputes about the material facts will preclude the granting of summary judgment. *Id.*

The movant bears the initial burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, (1986). A party must support its assertion that there is no genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations ... admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).[6]  Once the movant meets its burden under Fed. R. Civ. P. 56, the

---

[6] "Even in an unopposed motion [for summary judgment], ... the movant is not absolve[d] ... of the burden of showing that it is entitled to judgment as a matter of law." *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) (citations and internal quotation marks omitted); *see also One Piece of Real Property*, 363 F.3d at 1101 ("[T]he district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed, but, rather, must consider the merits of

non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248).

The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)). However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586 (citations omitted). "Speculation does not create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (emphasis in original) (citation omitted). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50 (citations omitted). In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case. *Celotex*, 477 U.S. at 322.

## IV.    Conclusions of Law

### A.    Principles of Personal Liability for Inmate-On-Inmate Violence

---

the motion ... [and] ensure that the motion itself is supported by evidentiary materials."); Commentary to 2010 Amendments to Fed.R.Civ.P. 56(e) ("summary judgment cannot be granted by default even if there is a complete failure to respond to the motion").

The Cruel and Unusual Punishment Clause of the Eighth Amendment[7] prohibits the "unnecessary and wanton infliction of pain." *Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 5 (1992)). To make out a claim for an unconstitutional condition of confinement "extreme deprivations" are required. *Id*. at 1304. A "prison custodian is not the guarantor of a prisoner's safety." *Purcell ex rel. Est. of Morgan v. Toombs Cnty., Ga*, 400 F.3d 1313, 1321 (11th Cir. 2005) (quoting *Popham v. City of Talladega*, 908 F. 2d 1561, 1564 (11th Cir. 1990)). His constitutional duty is to ensure the "reasonable safety" of inmates, "a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions." *Farmer v. Brennan*, 511 U.S. 825, 844-45 (1994). To violate the Cruel and Unusual Punishment Clause, the official must have been "deliberately indifferent to a substantial risk of serious harm to an inmate who suffers injury." *Marbury v. Warden*, 936 F.3d 1227, 1234 (11th Cir. 2019) (quoting *Lane v. Philbin*, 835 F.3d 1302, 1307 (11th Cir. 2016)).   To make out a claim for deliberate indifference, a plaintiff must demonstrate (1) "that he suffered a deprivation that was, 'objectively, "sufficiently serious,"'" (2) "that the defendant acted with 'subjective recklessness as used in the criminal law,'" — meaning a showing that the defendant was "actually, subjectively aware that his own conduct caused a substantial risk of serious harm to the plaintiff" and (3) "that even if the defendant 'actually knew of a substantial risk to inmate health and safety,' he 'cannot be found liable under the Cruel and

---

[7] The Eighth Amendment applies to convicted inmates.  The constitutional rights of pre-trial detainees like Forwood arise from the Due Process clause of the Fourteenth Amendment.  *See Hale v. Tallapoosa Cnty.*, 50 F.3d 1579, 1582 n.4 (11th Cir. 1995).  But the standard for liability for failure to protect from harm is the same under both the Eighth and Fourteenth Amendments. *Marsh v. Butler Cnty., Ala.*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001).

Unusual Punishment Clause' if he 'responded reasonably to the risk.'" *Wade v. McDade*, 106 F.4th 1251, 1262 (11th Cir. 2024) (en banc) (quoting *Farmer,* 511 U.S. at 834, 844-45, 839).

### 1.    Substantial Risk of Serious Harm

To satisfy the first element of a failure-to-protect claim — a substantial risk of serious harm — a plaintiff "must show a deprivation that is, 'objectively, sufficiently serious,' which means that the defendants' actions resulted in the denial of the minimal civilized measure of life's necessities." *Cottrell v. Caldwell*, 85 F.3d 1480, 1491 (11th Cir. 1996).

> "[T]he Eighth Amendment requires more than a scientific and statistical inquiry into the seriousness of the potential harm and the likelihood that such injury to health will actually be caused by exposure to [the challenged condition of confinement]. It also requires a court to assess whether society considers the risk that the prisoner complains of to be so grave that it violates contemporary standards of decency to expose anyone *unwillingly* to such a risk. In other words, the prisoner must show that the risk of which he complains is not one that today's society chooses to tolerate." *Chandler v. Crosby*, 379 F.3d 1278, 1289 (11th Cir. 2004) (emphasis and alterations in original) (quoting *Helling v. McKinney*, 509 U.S. 25, 36 (1993)).

The alleged condition must be "so extreme that it poses an unreasonable risk of serious damage to the prisoner's health or safety." *Richardson v. Johnson*, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam). The plaintiff must show that "serious inmate-on-inmate violence was the norm or something close to it." *Marbury,* 936 F.3d at 1234 (quoting *Purcell*, 400 F.3d at 1322). "[W]ithout showing a regular or constant threat of violence, procedures used by a prison — even if deficient — do not amount to deliberate indifference or violate the Eighth Amendment cruel and unusual punishment clause." *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 771 (11th Cir. 2016) (citing *Harrison v. Culliver*, 746 F.3d 1288, 1299–1300 (11th Cir. 2014)).

In measuring the relevant risk of harm from inmate-on-inmate violence, the focus is upon the area where the plaintiff was injured. *See Harrison*, 746 F.3d at 1299–1300 (limited number of inmate-on-inmate assaults in back hallway of prison where plaintiff was assaulted did not show

excessive risk of inmate-on-inmate violence creating substantial risk of serious harm); *Oliver v. Harden*, 587 F. App'x 618 (11th Cir. 2014) (incidents of violence in dayroom where plaintiff was attacked by another inmate insufficient to show exposure to constant threat of violence in that area); *Pitts v. Bullard,* No. CV 19-00038-TFM-B, 2021 WL 6689776, at *8 (S. D. Ala. Nov. 16, 2021), *report and recommendation adopted*, 2022 WL 211588 (S.D. Ala. Jan. 24, 2022) (evidence was insufficient to show that plaintiff faced a generalized substantial risk of serious harm from inmate violence in kitchen at Holman Prison where plaintiff was assaulted) (Moorer, J.); *Thomas v. Stewart,* No. 20-00300-KD-B, 2022 WL 636104, at *10 (S. D. Ala. Feb. 2, 2022), *report and recommendation adopted*, 2022 WL 634366 (S.D. March 3, 2022) (DuBose, J.) (plaintiff's statistics regarding inmate-on-inmate violence at Holman Prison as a whole were insufficient to show he faced a generalized substantial risk of serious harm from inmate violence in Holman's dining hall, where stabbing occurred).

### 2.    Deliberate Indifference to the Substantial Risk of Serious Harm

The second element — the prison official's deliberate indifference to the risk — "has both a subjective and objective component." *Marbury*, 936 F.3d at 1233.

1.    *Subjective component*

"To satisfy the subjective component, plaintiff must produce evidence that the defendant 'actually (subjectively) knew that an inmate faced a substantial risk of serious harm.'" *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099 (11th Cir. 2014) (citation and alterations omitted). The defendant "must be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Jail officials' deviation from policy or protocol, even if grossly unreasonable, does not relieve the plaintiff of the burden of showing that the defendants were objectively aware of a substantial

risk of harm to the plaintiff. *See Goodman v. Kimbrough*, 718 F.3d 1325, 1334 (11th Cir. 2013); *Bishop v. Bolar,* No. 15-0252-WS-C, 2016 WL 2962896, at *9 (S. D. Ala. April 6, 2016), report and recommendation adopted, 2016 WL 2962214 (S.D. Ala. May 20, 2016) (Steele, J.) ("Deviation or disregard of a prison rule or regulation…is not prima facie evidence to support a § 1983 action")

"The known risk of injury must be 'a strong likelihood, rather than mere possibility,' before a [prison official's] failure to act can constitute deliberate indifference." *Brown v. Hughes*, 894 F.2d 1533, 1537 (11th Cir. 1990) (per curiam) (citations omitted).

In an en banc decision, the Eleventh Circuit has recently clarified the standard for establishing liability on an Eighth Amendment deliberate-indifference claim. In *Wade*, 106 F.4th 1251, the court first described the intracircuit split between cases requiring that an inmate prove that a prison official acted with "more than mere negligence" and those requiring proof that he acted with "more than gross negligence." *Id.* at 1255. Repudiating these "dueling 'more than' formulations," the court returned to the Supreme Court's formulation of the standard that the plaintiff must prove that a defendant acted with "subjective recklessness as used in the criminal law." *Id.* (quoting *Farmer,* 511 U.S. at 839). This criminal law standard "generally permits a finding of recklessness only when a person disregards a risk of harm *of which he is aware*." *Id.* at 1256 (emphasis in original) (quoting *Farmer,* 511 U.S. at 836-37). The Eighth Amendment "does not outlaw cruel and unusual 'conditions'; it outlaws cruel and unusual 'punishments.'" *Id.* at 1257 (quoting *Farmer,* 511 U.S. at 838). Thus, an official's failure to alleviate a risk "that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* (quoting *Farmer,* 511 U.S. at 838).

Not only must this criminal standard of recklessness be met, but also the plaintiff must show that the defendant official was subjectively aware that his *own* conduct — rather than some preexisting risk — put the plaintiff at substantial risk of serious harm. *See id.* at 1258-1261.

The subjective component requires that the plaintiff prove that the official "possessed knowledge both of the infirm condition and of the means to cure that condition, 'so that a conscious, culpable refusal to prevent the harm can be inferred from the defendant's failure to prevent it.'" *LaMarca v. Turner*, 995 F.2d 1526, 1536 (11th Cir. 1993) (quoting *Duckworth v. Franzen*, 780 F.2d 645, 652 (7th Cir. 1985)). "Thus, if an official attempts to remedy a constitutionally deficient prison condition, but fails in that endeavor, he cannot be deliberately indifferent unless he knows of, but disregards, an appropriate and sufficient alternative." *Id.* at 1536.

"[A] general awareness of an inmate's propensity for being violent does not satisfy the subjective awareness requirement." *Oliver*, 587 F. App'x at 620 (citing *Carter v. Galloway*, 352 F.3d 1346, 1350 (11th Cir. 2003)). In *Carter,* the court affirmed summary judgment for the defendants in a § 1983 action where the plaintiff, a "Level 1" (best-behaved) inmate with no history of violence while in prison, was assaulted by a close-security "Level 5" (worst behaved) inmate with whom he shared a cell, and who was pending reclassification to maximum-security status. Although the defendants "clearly knew that [the Level 5] inmate Barnes was a 'problem inmate' with a well-documented history of prison disobedience and had been prone to violence," and although they also had "specific notice from Plaintiff that Inmate Barnes acted crazy, roaming his cell like a 'caged animal,'" this was not enough to show that defendants were deliberately indifferent to a substantial risk of serious harm. 352 F.3d at 1349-1350. Any "negligent failure" of the defendants to protect the plaintiff from attack did not create the sufficiently culpable state

of mind necessary to satisfy the subjective awareness requirement. *Id.* at 1350. To find defendants culpable, based on their awareness of Barnes' "propensity for being a problematic inmate," would "unduly reduce awareness to a more objective standard, rather than the required subjective standard set by the Supreme Court." *Id.; see Johnson v. Boyd*, 568 F. App'x 719, 722 (11th Cir. 2014) (attacker's destructive behavior in cell prior to attack did not sufficiently show a "strong likelihood" of injury to plaintiff); *Chatham v. Adcock*, 334 F. App'x 281, 293 (11th Cir. 2009) (no deliberate indifference shown where plaintiff's fellow inmate was a "problem inmate" with "violent tendencies," and plaintiff asserted that fellow inmate threatened him repeatedly in days before assault, but did not identify any specific serious threat from fellow inmate which he then reported to any other corrections officer before the assault on him); *McBride v. Rivers*, 170 F. App'x 648, 655 (11th Cir. 2006) (no subjective knowledge of a risk of serious harm where plaintiff merely advised he "had problems" with fellow inmate and stated he was "in fear for [his] life" if placed in same cell with his eventual assailant, but "did not identify a specific prior incident, from which the defendant could infer that a substantial risk existed"); *Lavender v. Kearney*, 206 F. App'x 860, 863–64 (11th Cir. 2006) ("General knowledge about an inmate's violent tendencies, without more specific information about the risk, does not constitute deliberate indifference").

> ### 2.    *Objective component*

Under the objective component of deliberate indifference, even if a defendant knows of a substantial risk to inmate health or safety, he cannot be liable under the Cruel and Unusual Punishment Clause if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Wade*, 106 F.4th at 1262 (quoting *Farmer*, 511 U.S. at 844).  This is so because "[a] prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe

custody under humane conditions." *Swain v. Junior*, 961 F.3d 1276, 1286 (11th Cir. 2020) (quoting *Farmer*, 511 U.S. at 844–45). "A prison official responds to a known risk in an objectively unreasonable manner if he knew of ways to reduce the harm but knowingly . . . or recklessly declined to act." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 620 (11th Cir. 2007) (quoting *Hale*, 50 F.3d at 1583).

### 3.    Causation

Section 1983 "requires proof of an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." *LaMarca*, 995 F.2d at 1538 (quoting *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982)). The official's acts or omissions must be "the cause — not merely a contributing factor — of the constitutionally infirm condition." *Id.*

For claims based on an excessive rate of inmate-on-inmate violence, two causal links must be established: a causal link between the defendant's act or omission and the excessive risk of harm and a causal link between the risk of harm and the plaintiff's injury. *LaMarca*, 995 F.2d at 1538–39. The Eleventh Circuit has described these two links as (1) an "individualized causation requirement (proof that a defendant contributed to the unconstitutional prison conditions)," and (2) "the more generalized causation requirement (proof that the unconstitutional prison conditions contributed to [the plaintiff's] injuries.)" *Williams*, 689 F.2d at 1384–85

The "critical causation issue" is "whether each individual defendant was in a position to take steps that could have averted the [assault on the plaintiff] but, through callous indifference, failed to do so." *Williams*, 689 F.2d at 1384. To demonstrate the necessary causal link, a plaintiff must show that the prison official "(1) 'had the means substantially to improve' the inmate's safety, (2) 'knew that the actions he undertook would be insufficient to provide [the inmate] with

reasonable protection from violence,' and (3) had 'other means [] available to him which he nevertheless disregarded.'" *Rodriguez*, 508 F.3d at 622 (quoting *LaMarca*, 995 F.2d at 1539).

The second causal link that must be shown is that between the prison conditions that create an excessive risk of substantial harm and the injuries to the plaintiff. Prison conditions unrelated to the circumstances causing plaintiff's injuries are not relevant. *See Thomas v. Stewart,* No. 20-00300-KD-B, 2022 WL 636104 at *11 (S. D. Ala. Feb. 2, 2022), *report and recommendation adopted*, 2022 WL 634366 (S. D. Ala. March 3, 2022) (Dubose, J.) (where stabbing took place in dining hall,  alleged security deficiencies in the dorms were unrelated and irrelevant to subject attack); *Gardner v. Mack*, No. CIV.A. 12-0281-CG-C, 2015 WL 877249, at *28 (S.D. Ala. Mar. 2, 2015) (Granade, J.) (while lack of video monitoring may present a cognizable constitutional claim, "it fails to do so here as Plaintiff cannot show how the Defendants lack of video equipment in Plaintiff's cell caused his injury."); *Castillon v. Corr. Corp. of Am., Inc.*, No. 112CV00559EJLCWD, 2015 WL 13732323, at *14 (D. Idaho Dec. 3, 2015) (violence statistics reflecting prison as a whole were not relevant where prison unit at issue housed close custody inmates on constant lockdown in secure environment rather than in general population).

### B.    Principles of Supervisory Liability for Acts of Subordinates in Causing Plaintiff's Injuries Due to Inmate-on-Inmate Violence

"The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." *Braddy v. Fla. Dep't of Lab. & Emp. Sec.*, 133 F.3d 797, 802 (11th Cir. 1998).  "It is well established in this Circuit that supervisory officials are not liable under § 1983 for the unconstitutional acts of their subordinates on the basis of *respondeat superior* or vicarious liability." *Christmas v. Harris Cnty., Georgia*, 51 F.4th 1348, 1354–1355 (11th Cir. 2022) (quoting *Cottone v. Jenne*, 326 F.3d 1352, 1360 (11th Cir. 2003)).  Supervisory liability occurs only when the supervisor "personally participates" in the alleged unconstitutional conduct

or when there is a "causal connection between the actions of a supervising official and the alleged constitutional deprivation." *Id.* at 1355. (quoting *Cottone*, 326 F.3d at 1355)

"The necessary causal connection can be established when a *history of widespread abuse* puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." *Christmas*, 51 F.4th at 1355 (emphasis added) (quoting *Cottone*, 326 F.3d at 1360). To put the supervisor on notice, such widespread abuse "must be *obvious, flagrant, rampant and of continued duration*, rather than isolated occurrences." *Id.* (emphasis added) (quoting *Keith v. DeKalb Cnty., Georgia*, 749 F.3d 1034, 1048 (11th Cir. 2014)). "Alternatively, the causal connection may be established when a supervisor's custom or policy . . . result[s] in deliberate indifference to constitutional rights or when facts support an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." *Id.*

For purposes of supervisory liability for subordinates' failure to follow policy, those policy violations themselves must show "the existence of a custom, so settled and permanent as to have the force of law, that ultimately resulted in deliberate indifference to a substantial risk of serious harm to [the plaintiff]" *Goodman v. Kimbrough*, 718 F.3d 1325, 1336 (11th Cir. 2013) (citing *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cnty., Fla.*, 402 F.3d 1092, 1116 (11th Cir. 2005) as "explaining that sheriff's policies or customs must themselves evidence a deliberate indifference to, and therefore a subjective awareness of, a substantial risk of serious harm").

"A [supervisor's] culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Keith*, 749 F.3d at 1053 (quoting *Connick v. Thompson,* 563 U.S. 51, 61 (2011)). "[A] supervisory official is not liable under § 1983 for failure to train unless: (1) his failure to train amounts to deliberate indifference of the rights of persons his subordinates come

into contact with; and (2) the failure has actually caused the injury of which the plaintiff complains." *Est. of Owens v. GEO Grp., Inc.*, 660 F. App'x 763, 774 (11th Cir. 2016) (citing *Keith*, 749 F.3d at 1052–53). The plaintiff must demonstrate that the supervisory official had "'actual or constructive notice that a particular omission in their training program causes [his or her] employees to violate citizens' constitutional rights,' and that armed with that knowledge the supervisor chose to retain that training program." *Keith*, 749 F.3d at 1052 (quoting *Connick*, 131 S. Ct. at 1360). To establish that a supervisor had actual or constructive notice of the deficiency of training, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary." *Id.* at 1053 (quoting *Connick*, 131 S. Ct. at 1360). Where an injury occurs as a result of a correctional officer violating jail policies, the supervisory officials responsible for issuing the policies cannot be liable when they are not aware that employees routinely violated the policy. *See Keith*, 749 F.3d at 1049. "Our decisions establish that supervisory liability for deliberate indifference based on the implementation of a facially constitutional policy requires the plaintiff to show that the defendant had actual or constructive notice of a flagrant, persistent pattern of violations." *Goebert v. Lee Cnty.*, 510 F.3d 1312, 1332 (11th Cir. 2007).

The practice of allowing mixed-custody classes of inmates to be housed together does not create supervisory liability in the absence of "widespread abuse such that prison officials must have known about the palpable danger of serious injury." *Estate of Owens*, 660 F. App'x at 773*; see Jenkins v. DeKalb Cnty., Ga.*, 528 F. Supp. 2d 1329 (N.D. Ga. 2007), *aff'd sub nom. Jenkins v. DeKalb Cnty., Georgia*, 307 F. App'x 390 (11th Cir. 2009) (summary judgment granted in favor of sheriff when plaintiff failed to produce evidence that sheriff was on notice of widespread practice of housing vulnerable inmates with violent and assaultive inmates, as occurred in this case). Indeed, "courts have generally declined to impose liability where the complained-of danger

resulted from mixing inmate custody classifications." *Estate of Owens,* 660 F. App'x at 773 (citing *Jones v. Diamond*, 594 F.2d 997, 1015 (5th Cir. 1979) for proposition that "[t]he Constitution does not expressly require states to develop prisoner classification plans for the incarceration of convicted criminals."); *see, e.g., Carter*, 352 F. 3d 1346.

There can be no supervisory liability when there is no underlying constitutional violation. *Knight through Kerr v. Miami-Dade Cnty*, 856 F.3d 795, 821 (11th Cir. 2017).

### C.    Defendants Cochran and Oliver Are Entitled to Qualified Immunity on Plaintiff's Claims

Qualified immunity protects governmental officials performing discretionary functions in their individual capacities from civil suit and liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Hill v. Cundiff*, 797 F.3d 948, 978 (11th Cir. 2015) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)).  "When a court concludes the defendant was engaged in a discretionary function, 'the burden shifts to the plaintiff to show that the defendant is *not* entitled to qualified immunity.'"  *Id.* (emphasis in original) (citation omitted).  Plaintiff carries this burden by establishing (1) that defendants violated a constitutional right, and (2) that the right was "clearly established" at the time of the alleged violation.  *Crocker v. Beatty,* 995 F.3d 1232, 1240 (11th Cir. 2021), *cert. denied,* 142 S. Ct. 845 (2022).

In analyzing whether the law was "clearly established," the dispositive question is whether the law at the time of the challenged conduct gave the governmental official "fair warning" that his conduct was unconstitutional.  *Wade v. United States,* 13 F.4th 1217, 1225 (11th Cir. 2021). Fair warning is defined as "beyond debate." *D.C. v. Wesby,* 583 U.S. 48, 62-64 (2018). Therefore, the law must be "settled," which means "it is dictated by 'controlling authority' or 'a robust consensus of cases of persuasive authority.'"  *Id.* at 63 (citations omitted).  The precedent must be

clear enough that "every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Id.* To satisfy this standard, the contours of the rule must be identified to a "high 'degree of specificity'." *Id.* (quoting *Mullinex v. Luna,* 577 U.S. 7, 12 (2015)). The doctrine of qualified immunity protects "all but the plainly incompetent." *Malley v. Briggs,* 475 U.S. 335, 341 (1986).

In determining "clearly established" law, the court "looks only to binding precedent — cases from the United States Supreme Court, the Eleventh Circuit, and the highest court of the state under which the claim arose" at the time of the violation. *Coffin v. Brandau,* 642 F.3d 999, 1013 (11th Cir. 2011) (en banc).

The acts and omissions of Cochran and Oliver, as alleged in the complaint, fall within their respective job responsibilities, and thus fall within their discretionary function. *See Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1332 (11th Cir. 2004) (to determine whether official is engaged in discretionary function, court considers whether acts official undertook "are of a type that fell within the employee's job responsibilities.") (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004)). Thus, the burden shifts to the plaintiff to show that Oliver and Cochran were not entitled to qualified immunity by establishing that (1) they violated a constitutional right and (2) that right was clearly established at the time of the alleged violation. Plaintiff has not established either of these requirements.

### 1.    No Constitutional Violation

#### a.    No exposure to substantial risk of serious harm

Plaintiff has not shown that Forwood was exposed to a substantial risk of serious harm because of the failure to implement an objective classification system. The undisputed evidence shows that such a system had been implemented. Plaintiff alleges no other Jail condition as the

basis for his claims.  So, summary judgment is due on his claims for the simple reason that the foundational factual premise for those claims is erroneous.

Further, had any other Jail condition been alleged as the basis for Plaintiff's claim, there is no evidence that Forwood was injured as the result of any condition of the Jail so extreme as to be intolerable by today's society and to pose an unreasonable risk of serious harm to him.  In terms of any *generalized* risk of harm due to inmate-on-inmate violence in the general jail population at MCMJ, that risk of harm is irrelevant in this case because Forwood and Oslan were isolated from the general population while housed in the Suicide Wedge.  And there the level of monitoring and supervision was higher than in any other area of the Jail.  The pod officer had a clear view into the cell where Forwood and Oslan were housed. Given the presence of a pod officer, two floor officers, and two nurses in Pod 1005, the area was not understaffed on the evening Forwood was injured.

In terms of any *particular* risk of harm to Forwood by being housed with Oslan, the evidence fails to establish a strong likelihood of serious harm to Forwood as a result of that housing assignment.  Although Oslan had a maximum-security classification, he did not exhibit any violent propensities or hostility toward Forwood or Gillman, and neither of them objected to Oslan being their cellmate or expressed any hostility towards him.  Thus, there is no evidence that the later altercation was anything but a completely unanticipated event.

### b.    No deliberate indifference

Second, no evidence exists of any deliberate indifference on the part of Oliver or Cochran to a substantial risk of serious harm to Forwood in the failure to implement an objective classification system, as alleged. Instead, they initiated the development and full implementation of such a system, as recommended by the DOJ and the NIC, prior to the incident of July 31, 2021.

Even if some other claim of deliberate indifference had been made, either to the specific risk of harm arising from housing Forwood with Oslan or to some more generalized, excessive risk of inmate-on-inmate violence, no evidence exists that Cochran or Oliver was deliberately indifferent to such risks. First, they could not be deliberately indifferent to the *specific* risk of harm to Forwood in sharing a cell with Oslan because neither was aware of this housing assignment. Second, even if there were evidence that Forwood was exposed to some substantial risk of serious harm due to excessive inmate-on-inmate violence, no evidence exists that Cochran or Oliver failed to respond reasonably to any such risk. Rather, the undisputed evidence shows their diligence in the implementation of an objective classification system, as recommended by the DOJ; the expansion of the docketing, jail intake and sally port areas, as recommended in the 2015 NIJO report; the renovation of the "Barracks" to allow it to house both minimum and medium-security inmates and thus alleviate overcrowding in the Jail; other upgrades in the jail facilities to improve security; and other successful efforts by Cochran to reduce overcrowding and increase hiring and retention of correctional staff. These measures, among others, demonstrate a reasonable response, as a matter of law, to any unreasonable risk of serious harm to inmates posed by Jail conditions that Cochran and Oliver were subjectively aware of and which they had the authority and means to ameliorate.

### c.    No causation

Finally, there is no evidence that any act or omission by Cochran or Oliver caused a constitutionally infirm condition, which in turn caused the injury to Forwood. There is no evidence that either Cochran or Oliver was in a position to take steps that could have averted the assault upon Forwood but, through callous indifference, failed to do so.

### d.    No supervisory liability

The Court rejects Plaintiff's claim against Cochran and Oliver for failure to properly train, assign, and supervise correctional officers regarding the classification of inmates. First, the claim fails to state a plausible claim for relief because it contains no factual allegations to support the conclusory allegations of a failure to train, assign, and supervise correctional officers. *See Vielma v. Gruler*, 808 F. App'x 872, 883 (11th Cir. 2020) (characterizing allegations of failing to "adequately" train officers as conclusory); *Hathcock v. Armor Correctional Health Servies, Inc.,* 186 F. App'x 962 at *1 (11th Cir. 2006) (same).

Second, there is no evidence that either Cochran or Oliver had actual or constructive notice that a particular omission in the training program for the objective classification system was causing jail employees to violate the constitutional rights of inmates and that armed with that knowledge they chose to retain that training program. There is no evidence of a pattern of similar constitutional violations by untrained employees so as to establish actual or constructive notice of the deficiency of any training. There is no evidence that jail employees routinely violated the objective classification system in the housing assignments of inmates. There is no evidence of a widespread or routine practice in housing vulnerable inmates with violent or assaultive inmates to give Cochran or Oliver knowledge, either actual or constructive, of such a practice.

Finally, there can be no supervisory liability because there is no evidence of an underlying constitutional violation by any of the correctional officers involved in housing and monitoring Forwood and Oslan in the Suicide Wedge.

### 2.    No Clearly Established Law

Finally, even if the Plaintiff had evidence to support his claim of a constitutional violation of Forwood's rights by Cochran or Oliver, causally connected to his injuries, Plaintiff has not shown clearly established law that would have placed them on notice that they would face liability

for anything they did or failed to do in this case. The law is clearly established that it is not a reasonable response for an official to "do nothing," when confronted with prison conditions that pose a substantial risk of serious physical harm to inmates. *See Dickinson v. Cochran*, 833 F. App'x 268, 274 (11th Cir. 2020) (citing *Marsh*, 268 F.3d at 1034 and *Hale*, 50 F.3d at 1583–85). This is not such a case. Even if there were evidence of a substantial risk of serious harm due to excessive inmate-on-inmate violence, Oliver and Cochran, rather than doing nothing, took many affirmative steps over the course of a decade to reduce the risks of inmate-on-inmate violence through the implementation of an objective classification system, and by alleviating overcrowding and understaffing within their power to do so.

The law was not clearly established, at the time of Forwood's injuries, that any jail personnel would face Eighth Amendment liability simply because inmates with differing classifications were housed together. Case law holds to the contrary, even for those involved in the housing decision, let alone for those not involved and even unaware of that housing assignment, such as Cochran and Oliver. *See Estate of Owens*, 660 F. App'x at 773; *Carter*, 352 F.3d at 1349–1350.

### D.    Defendant Mobile County Is Entitled to Summary Judgment on Plaintiff's Claims

Alabama counties only have the powers and duties delegated to them by the Alabama Legislature. *McMillian v. Monroe Cty., Ala.,* 520 U.S. 781, 790 (1997). Because Alabama counties possess only those powers delegated to them by the legislature, "the Alabama Code determines the role of counties in operating county jails." *Ex parte Sumter County*, 953 So. 2d 1235, 1238 (Ala. 2006).

Pursuant to Ala. Code § 11-14-10, Alabama counties are "required to maintain a jail within their county." The Alabama Supreme Court in interpreting the phrase "maintain a jail"

has held that the Legislature "intended to require the county commission to keep a jail and all equipment therein in a state of repair and to preserve it from failure or decline." *Ex parte Sumter County,* 953 So. 2d at 1238 (citing *Keeton v. Fayette County,* 558 So.2d 884, 886 (Ala.1989) (concluding that the statutory mandate that the county "maintain a jail" simply meant that the county must "maintain the jail building and its equipment")). Under § 14-6-104, counties are obligated to pay expenses "incident to the construction, maintenance, sanitation, healthfulness and hygiene of each county jail…" Ala. Code § 14-6-104. The Alabama Supreme Court has interpreted § 14–6–104 as creating in counties an "obligat[ion] to pay any expenses for the maintenance of the jail." *King v. Colbert County,* 620 So. 2d 623, 625 (Ala. 1993); *Marsh vs. Butler Cty., Ala.,* 268 F.3d 1014, 1026 (11th Cir. 2001) (determining that Alabama statutes limit counties duties to a "limited role in building and funding the jails.").

As a matter of well-settled law, "Alabama counties have no responsibility for daily operation of county jails and no authority to dictate how jails are run." *Marsh*, 268 F.3d at 1027. Accordingly, allegations pertaining to inmate classification, inmate supervision, law-enforcement policies or the training, supervision, hiring, or firing of the sheriff's employees and anything other than funding and keeping the jail in a state of repair do not fall under the legal duties of Defendant Mobile County, Alabama.

As it pertains to the requirements related to Mobile County's legal duties, based on the evidentiary materials provided by the Defendants, from 2015 through 2021 the combined budget between the Mobile County Metro Jail and Sheriff's Office has increased each year. The funds allotted for the Mobile County Metro Jail and Sheriff's Office consistently comprised approximately ⅓ of the Mobile County Commission's total budget. Further, the County has taken multiple steps to keep the jail and all equipment therein in a state of repair and to preserve

it from failure or decline. Defendant Mobile County, Alabama's actions do not amount to deliberate indifference and any alleged lack of funding or repairs by Defendant Mobile County, Alabama was not the cause of any damage suffered by Plaintiff.

### Conclusion

For all the above foregoing reasons, the Court finds that there are no genuine issues of material fact and that the Defendants are entitled to entry of judgment as a matter of law.  As such, the Defendants' motions for summary judgment are granted as to all claims and the action is dismissed with prejudice in its entirety.  A separate judgment will enter.

**DONE** and **ORDERED** this 27th day of January 2025.

  **/s/WILLIAM E. CASSADY**
**UNITED STATES MAGISTRATE JUDGE**